I should say we do intend to take about a ten minute break after the third argument. We'll let counsel get settled here but the next case for argument is United States v. Good morning, your honors. I'm Josh Lee from the Colorado Federal Public Defender's Office and I represent the appellant Roy Roberts. In this sexual abuse trial, the prosecution undermined Mr. Roberts' defense to the charges leveled against him by improperly injecting character into this case. The good character of the alleged victim's adoptive mother, Melanie Henry, and the supposed bad character of my client Mr. Roberts himself. Mr. Roberts' defense to the most serious charges in this case, those involving R.R., was that Melanie Henry caused R.R. to say that he had been abused by Mr. Roberts when in fact he hadn't. In response to this defense, the prosecution argued that Melanie Henry was a school teacher of 22 years who spent her entire life educating, helping, and loving on kids, and then says, does that sound like Melanie Henry is to blame? Now that was a character argument and as such... Now that was in closing? Yes, actually they did it both in their initial closing and in their rebuttal closing. So it was a highly salient argument. You can't argue, was that your position, the validity of a particular witness's testimony? You can certainly argue the validity of a particular witness's testimony, but you can't do it by way of character, and that's what the prosecution did in this case. By pointing out that she was a second or third grade teacher and had been doing it for years? Yeah, so if you're arguing the credibility of a police officer, the prosecution can't say, police officers don't lie. This is somebody who dedicates his life to protecting the community. He would never lie, and that's what they did in this case. It's the equivalent of police officers don't lie. What they said is, not just that she's a teacher, but this is somebody who's devoted her entire life to educating, helping, and loving on kids. She can't be to blame. That's a character argument. The quote that you began with is, does that sound like? Was that from the rebuttal? No, in the initial closing argument, they say, does that sound like Melanie Henry is to blame? That's from the initial closing. Oh, to blame. Yeah, does that sound like Melanie Henry is to blame? And they're doing this. I'm sorry, does that sound like what? So does that sound, so the prosecution is discussing the theory of defense, which is that Melanie Henry put R.R. up to these allegations in order to get the adoption done. And the prosecutor says this stuff about Melanie Henry's character, and then says, does that sound like Melanie Henry is to blame? So in other words, the argument is, the defense can't be true because she's not the type of person who would do this sort of thing. So now, the government doesn't dispute that it's plainly improper to argue the good character of a prosecution witness or a third party. And the government does not offer any alternative interpretation of these remarks. And again, these were highly salient remarks. They were presented both in the initial closing and in the rebuttal closing. And the prejudicial effect of the prosecution's argument based on Melanie Henry's good character was magnified by a second error that unfairly tarred Mr. Roberts as a bad fight. So the prosecution elicited and then repeatedly emphasized in their closing argument an incident in which Mr. Roberts allegedly abruptly abandoned his kids on the side of the highway to somebody that the kids barely knew. That was plainly erroneous for multiple reasons, including the fact that the prosecution did not provide proper notice that it was going to rely on this other bad act. Why is that a bad act? I've been left on the road for someone to pick up with someone waiting with me. I don't understand why that is so bad. So it's bad for several reasons. You have to think about this in context. And the prosecution definitely thought it was bad, the way they elicited it and used it in closing arguments. They established first that this woman was somebody who the Roberts family had virtually no connection to. I mean, they were related as cousins, but they didn't spend time with one another. They didn't have a meaningful relationship. He called her. He calls her up, right? He calls her up. And then the very same day that he's like, I need you to take these kids. That very same day, he goes and drops them off on the side of the interstate. And I think the jury would think, if you're going to leave your kids with somebody, you go over to their house, have the kids meet this person, have the kids get used to the house. At a minimum, spend the day there. You don't just leave them on the side of I-40. And you don't have to take my... I thought it was an exchange at that place. They weren't just standing... No, no, yeah, it was an exchange. They weren't just standing alone. No, no, no, yeah. It was an exchange. Well, what if it had been they dropped them off or met them at Wendy's Hamburger? I think that would be bad, too. What needs to happen is these kids need to feel comfortable with this woman. I think that what would normally happen is you would take them and introduce them to her and to her house, not just drop them off the same day that you first spoke to them. And again, you don't have to take my word for it. The prosecution clearly thought this was important. They brought it up three times in closing, and they brought it up three times when responding to Mr. Roberts' theory of defense. But again, the error that I've started with, the character argument based on Melanie Henry, I think that error on its own was sufficiently prejudicial to call for reversals. Well, let's talk about that because that's broad language. Detail the requirements of prong three and tell me why this was... Exactly. Likely would have changed the outcome of the case. Not quite. So there has to be a reasonable probability, which is less than a preponderance, that a jury could have had a reasonable doubt. Really, if you can say we can't as a court be confident that the jury wouldn't have acquitted but for this error, prong three is satisfied. And here's why it is in this case. This was a case in which there was no forensic evidence. There were no incriminating statements from Mr. Roberts. There were no third party witnesses. The prosecution's case rested entirely on the testimony of two witnesses who there were identifiable reasons to doubt. And contrary to what the answer brief repeatedly says, there was no indication that R.R.'s and C.R.'s accusations were independent of one another. And in fact, there was a substantial basis to suspect that R.R.'s accusations, and then by extension C.R.'s accusations, originated with Melody Henry. One, R.R.'s accusations only arose after Melody Henry decided she wanted to adopt R.R. and told R.R. that. Second, R.R. was at a very suggestible age, seven years old at the time of his forensic interview, and 10 years old at the time of trial. And this is somebody who would have wanted to please Ms. Henry and probably would have wanted to stay her and be adopted by her. I also have to say that there was evidence presented of consciousness of guilt on the R.R.'s accusations. She was not forthcoming about the fact that she had discussed these allegations with R.R. before his forensic interview, and she was not forthcoming about the fact that she was really the one who initiated the investigation of Mr. Roberts. And then finally, with regard to R.R., there were strong indications that Ms. Henry, in fact, did influence what R.R. said on the stand. So, you know, the most telling example of this is that Melody Henry decided that she wanted to refer to R.R.'s mother by her mating name, Brittany King, as opposed to Brittany Roberts, because she didn't want anything to do with Roberts. And R.R. on the stand also referred to his mother as Brittany King, just like Ms. Henry did, even though he never would have known her as Brittany King in his life. So there were a lot of reasons to suspect, enough to give rise to reasonable doubt, that these accusations may have originated with Melody Henry. All of which were vetted with the jury. Jury considered all of this. Exactly. And the jury then heard, Melody Henry is not the type of person who would do this. That's why it's prejudicial, because you have a plausible defense and then you have an error that directly collides with that defense. That's a recipe for prejudice. Plausible defense and an error that directly collides with it. It was also prejudicial as to C.R.'s accusations, because again, as we've argued in our brief, there was a substantial basis to suspect that C.R.'s accusations were not founded in reality. C.R. was suffering from psychosis with delusions of persecution around the time of his forensic interview. And then C.R. was probably exposed to R.R.'s accusations before C.R.'s own forensic interview. So again, I think that acquittal was a real possibility based on this evidence. And then the prejudicial injection of character into this case, both through the argument based on Melody Henry and through the prosecution's use of him dumping his kids off on the side of the road. Did they ever say dumping? They did not, but that's how it would have looked to the jury. They didn't. But what they did show is that he didn't have any meaningful relationship with this woman. The kids didn't either. He calls her up one day, says, take these kids, and then he leaves them on the side of the highway. Well, counsel, you keep calling it, in your brief, it was bad father character evidence. But the government responds that these events were factually true. And you just argued a moment ago, well, what should have happened in terms of how someone should transfer their children? But the facts are what they are here. And those were relevant to establish timeline, to maybe, in the government's view, to explain potentially delayed reporting. So it's intertwined with other events of the case. It's not bad father character evidence. But how do you respond to that specifically, rather than just saying, well, yeah, those are the facts. Maybe not what you would do or what I would do with children, but that's what Mr. Roberts did. So I want to make sure I understand the court's question. Is it whether this evidence is intrinsic, or is it whether there's a non-character purpose for the evidence? Both. Okay. So it's not intrinsic, because if you look at this court's factors and cushion, it doesn't meet any of them. This did not occur during the offense. It was not a preliminary or a background to the offense. And the reason we know it wasn't inextricably intertwined with the offense is because R.R. told the complete story on the witness stand of the events, and he didn't mention this at all. So that's why it's not intrinsic. Now, whether it's relevant to some issue other than character, I have two responses to that. The first is it doesn't matter to my notice board. If this is non-intrinsic and is another act, the prosecution has to provide notice that it's going to use it, even if it's relevant to some issue. It didn't provide that notice, and so the evidence is inadmissible. The notice is a conditioned precedent to admissibility. But second, the government hasn't actually established that the evidence that I object to, the evidence of him abruptly leaving his kids with Miss Henry on the side of the highway, was relevant to timeline or anything else. They established that the date that he went to live with her is relevant, but they haven't offered any proper purpose for this side-of-the-road testimony. And that's the one that they bring up three times in closing, and they still have not been able to identify it. You say the evidence that you object to, but the question is, what did the defense counsel at trial object to, and apparently had a much different take on this than you do. Well, there's no objection. So there was no objection. That means that our review is for plain error. But doesn't that mean more? That your characterization of all of this and how the jury must have interpreted it and so forth isn't even shared by defense counsel. I don't think we can infer that. No objection. We never infer that from an absence of an objection. What we do when there's an absence of an objection is we review for plain error, and we've met that. It's plain that you have to provide notice of other act evidence, and it's plain that this was other act evidence. And I'll reserve 37 seconds for rebuttal. Thank you. May it please the Court. My name is Linda Epperle, and I represent the United States in this case. We believe, number one, the district court did not plainly err in allowing testimony about the transfer of the children. We disagree that that is character evidence. We do not believe that there was evidence presented in the nature that opposing counsel has just described regarding Ms. Henry. So we do not feel that other than in the defendant's minds on appeal that there is this setup between bad father versus good Ms. Henry. Secondly, the district court did not plainly err regarding allegedly improper remarks in closing. The remarks were brief. The remarks played an important role in setting forth the timeline of these events because we're hunting markers, significant events, that a kid that is five or six or seven years old will be able to remember. Also, the evidence went to explaining more about the context of this family in order to understand how all of this happened. And then finally, we'd argue that there is no cumulative error here and certainly no plain error. The government readily admits that there was not notice given under 404B. There was not a specific instruction given under 404B regarding where this transfer of custody took place. And the reason for that is that the defendants didn't call for one. The judge didn't call for one because at the time of trial, in the course of the litigation, the parties did not see this as character or other bad acts evidence. Now, this is a case where there were bad acts that all the parties were very careful about, which was the determination of why the mother of this family was no longer around. And in footnote four, we explained that this was a defendant who had been convicted and ultimately would serve time for first degree involuntary manslaughter because he was drunk driving the car that killed this woman so tragically. But all the parties knew we needed to not deal with that because that would be a character flaw. That would be a character evidence. We didn't try to argue it. No one did. And we were very careful with the witnesses, including Ms. Henry, who attempted to explain how this family dynamic had occurred. And I believe that the language they settled on was that the father needed to arrange a home for the kids because he would not, quote, be able to care for them. Well, that's because he was on the verge of going to prison. I agree that waiting on the side of I-40 is not the best place to make a custody exchange. But as somebody who also did family law for a number of years, custody exchanges happen in a number of different locations. I-40, Okema, is about halfway. It's a place where many custody exchanges occur. There's nothing about this one that in any way allows the kind of characterization that was included in the defense briefs on appeal. The evidence simply doesn't support that. There were 11 words spoken by Ms. Henry about that drop-off. The question was, where were you able to pick the boys up? Answer, we met on the side of I-40 in Okema, Oklahoma. Question, just on the side of the road. Answer, uh-huh. 11 words. And during closing argument, it was mentioned three times. On the first of those, the attorney argued that Ms. Henry went to pick them up in the middle of Okema, Oklahoma so they wouldn't have to sleep in a car another night. Does that sound like Melanie is to blame? The second, she gets a call and where does she go? She goes to the side of I-40 to pick them up on the side of the road. That is the lady who loves these kids. And then finally, in what clearly is a discussion of the timeline, and again, all the parties are trying to identify significant markers that help these kids know when what happened, the government argued looking. Going back to the time frame, R.R. described for you that after his mom's death and before Melanie, who's Ms. Henry, and Jason got him, mom passed away in December of 2017 and Melanie and Jason picked him up on the side of the road in February 2019. That's it. The government did not use this evidence to make arguments about this defendant's character. In fact, Ms. Henry, I believe, but I know the testimony came in through one of the witnesses, describing what this family had been through. Granted, things probably weren't easy even before the mother passed away. I mean, there was talk of them sleeping in a house where they moved the bed into the living room in the winter for heating issues. And there was, of course, some argument about whether Halloween is scary movies, October, that kind of thing. But certainly after the mother passed away, this family was in crisis. There was testimony that within days, this man took R.R. and a younger child named Andy. And they lived in several places. And it's described in our brief the number of family members they lived with. They lived with the defendant's father, the kid's grandfather on two different occasions. They lived with other family friends. And this defendant was trying to get on his feet. And that is, in fact, what he told Ms. Henry when he talked to her on the phone that day. And she described that on the stand, that he, you know, cared about the kids, that he was trying to get back on his feet. He needed to get a job, but he needed some help with them in the meantime. So if this situation was discussed at all as far as his character, I would argue that the situation at trial was that there was a discussion of this and that it showed this man did care about these kids. He was trying to find a place, safe place for them to go. And after they finally make this transition, and they're with Ms. Henry, at least R.R. and the younger child, Andy, about nine months later, in October 2019, that's when the first disclosure comes from R.R. And the government would argue that the reason that disclosure comes at that time is not because Ms. Henry was somehow attempting to unduly influence the child. That comes at a time when he has, at that point, spent some months in a stable home. That is a time when by October he has started school. There's more stability. That is also a time when, and we don't know, I don't know whether this was known to this kid R.R., but it's about a month after his father went to prison, which would also, if he knew about it, make him feel more safe. I am not aware, I did not write the brief in this case, but based upon the argument that was just made, I'm not aware of the evidence regarding a consciousness of guilt and wanting to hide the true purpose that Ms. Henry initiated that. I do recall that there was discussion at trial about Ms. Henry and ultimately R.R. calling the dead mother by her maiden name, but a lot of the other things that were discussed, I'm not prepared to rebut because I don't recall that from the briefs or the transcript, and I invite a citation as to where that is. After R.R. discloses in October of 2019, about two weeks later, C.R., the older child, discloses. It's important to note that at that point, well really from the time that the mother passed away in December of 2017, R.R. never lived with his older half-brother again. He went to live with his side of the family. They didn't have contact. They weren't at school together so far as anyone can tell. At that point, C.R. was 18 or something and R.R. is just starting school in first or second grade, and I think it would be reasonable to assume that the younger child discloses, DHS is involved, there's a forensic interview. We know that at some point R.R. has said that at one time before mom died, when they were all in the White House, he walked into the living room and saw the defendant and some people without all their clothes on, and his dad told him to go back to bed. I just think it's entirely reasonable, and again I can't cite you to the record on this, but the DHS followed up with that and went and found the older boy to see what had happened in that case. In essence, the government would argue that in this case there is not clear character error, that there's not clear character evidence that anybody at trial identified as such. The district court did not plainly err in taking some kind of action about the closings in this prosecutorial misconduct in closing arguments, and the examples given there are nowhere near what happened here. If anything, under Salenzo, what this court faces today are a couple of stray, improper, perhaps, remarks. That is not enough to require overturning a jury verdict and requiring the parties to go through this again, and we would argue that under the cases involving plain error, there was not error. If there was error, it wasn't plain. Nothing about this should cause this court any discomfort or any reason to doubt this jury's verdict. If there are no further questions, I'd ask you to affirm. Thank you. Thank you, counsel. You have rebuttal time remaining. Thank you. I just want to say two quick things. One, opposing counsel spent most of her argument talking about issue number one, but this court can reverse based on issue number two by itself. That was the good character argument that the prosecution made regarding Melanie Henry. Point number two that I want to make, opposing counsel characterized what the prosecution said about Melanie Henry as stray remarks. It was not that at all. There were two times that the prosecution discussed Mr. Roberts' theory of defense, and both times it made this point about Melanie Henry's character. That was plain erroneous, and it was prejudicial, and so I'd ask you to reverse it. Thank you for your arguments, counsel. The case is